E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0631
     Facsimile: (213) 894-0141
     E-mail:     kathrynne.seiden@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 8:23-100(B)-CJC-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT TIBET ERGUL |
| v. | Hearing Date: May 30, 2024 |
| CHANCE BRANNON, TIBET ERGUL, and XAVIER BATTEN, | Hearing Time: 10:00 a.m. Location:    Courtroom of the Hon. Cormac J. Carney |
| Defendants. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Kathrynne N. Seiden, hereby files its Sentencing Position for Defendant Tibet Ergul.

//
//
//
//
//
//

1     This Sentencing Position is based upon the attached memorandum

2  of points and authorities, the files and records in this case, and

3  such further evidence and argument as the Court may permit.

4  Dated: May 20, 2024              Respectfully submitted,

5                                   E. MARTIN ESTRADA
                                    United States Attorney
6
                                    CAMERON L. SCHROEDER
7                                   Assistant United States Attorney
                                    Chief, National Security Division
8

9                                   _____/s/_____
                                    KATHRYNNE N. SEIDEN
10                                  Assistant United States Attorney

11                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3
    "The rifle is in a box in my room waiting to be used in the
4
upcoming race war . . . VOTING DOESN'T CHANGE ANYTHING.  IF IT DID,
5
IT WOULD BE ILLEGAL."  (Dkt. 83 ("Plea Agreement") ¶ 14.)  Defendant
6
wrote these words to his coconspirator, with whom he conspired to
7
attack Orange County's power grid and with whom he firebombed a
8
Planned Parenthood in March 2022.  (Id.)  In February 2024, defendant
9
pled guilty to one count of conspiring to damage an energy facility,
10
in violation of 18 U.S.C. § 1366(a), and one count of intentionally
11
damaging a reproductive health services facility, in violation of 18
12
U.S.C. § 248(a).  (Dkts. 84, 86.)  In April 2024, the United States
13
Probation and Pretrial Services Office ("Probation") issued its
14
Presentence Investigation Report (PSR), in which it calculated
15
defendant's offense level as 21 and his Criminal History Category as
16
I, for a Guidelines range of 37 to 46 months' imprisonment.  (PSR
17
¶ 177.)  After applying upward departures to account for aggravating
18
and dismissed conduct, Probation concluded that defendant's adjusted
19
Guidelines range is 78 to 97 months and recommended that defendant be
20
sentenced to 78 months' imprisonment, a three-year term of supervised
21
release, $1,000 in restitution, and a $125 special assessment.  (Dkt.
22
111.)  The government disputes Probation's calculations, but agrees
23
with Probation's sentencing recommendation and respectfully requests
24
that the Court sentence defendant accordingly.

25

## II.   STATEMENT OF FACTS

26
    Beginning around February 2022 and continuing through at least
27
March 13, 2022, defendant conspired with his co-defendant, Chance
28
Brannon ("Brannon"), to use a Molotov cocktail to damage a Planned

Parenthood.  (Plea Agreement ¶ 14.)  Defendant became a member of the conspiracy knowing its objective and intending to help accomplish that objective.  (Id.)  Defendant and Brannon targeted Planned Parenthood because it provided reproductive health services and because they wanted to make a statement against abortion, scare pregnant women away from obtaining abortions, deter doctors, staff, and employees from providing abortions, intimidate and interfere with the patients of the clinic, and encourage others to engage in similar acts of protest.  (Id.)

On or about March 12, 2022, in defendant's garage, defendant and Brannon put together a Molotov cocktail.  (Id.)  In the early morning of March 13, 2022, disguised in dark clothing, hoods, masks, and gloves, defendant and Brannon drove to the vicinity of a Planned Parenthood in Orange County, California, approached the entrance, ignited the Molotov cocktail, and threw it at the clinic entrance, intentionally starting a fire.  (Id.)  Defendant and Brannon then fled.  (Id.)  Defendant and Brannon intentionally and successfully damaged the clinic, which was forced to close temporarily and to reschedule approximately 30 patients' appointments.  (Id.)  The day after he and Brannon started the fire, defendant bragged to an acquaintance about having started the fire and noted that he wished he "could've recorded the combustion."  (Id.)

In June 2022, following the Supreme Court's decision in Dobbs v. Jackson Women's Health Organization, in which the Court overturned Roe v. Wade, defendant and Brannon planned to use a second Molotov cocktail, which they kept in a backpack in defendant's garage, to damage a second Planned Parenthood clinic.  (Id.)  Defendant and

1  Brannon did not follow through with their plan because they saw law

2  enforcement near the clinic they planned to target.  (Id.)

3      Beginning sometime in 2022 and continuing through approximately

4  the time of their arrest, defendant conspired and agreed with others,

5  including Brannon, to knowingly and willfully damage the property of

6  an energy facility, namely, a Southern California Edison electrical

7  substation, and to cause interruption to and impairment of the

8  facility's functioning, with the goal of debilitating Orange County's

9  power grid.  (Id.)  Defendant and his coconspirators planned to do so

10  using either firearms or the Molotov cocktail defendant possessed in

11  his garage.  (Id.)  Defendant and Brannon consulted with an associate

12  about surveillance, drone operations, and firearms.  (Id.)

13      In March 2023, defendant messaged an associate to say that he

14  had found a substation to target in Orange, California, which had a

15  "fence area [] nearby enough to a switch."  (Id.)  Defendant also

16  sent Brannon aerial photographs of the substation and suggested

17  "go[ing] there at 3am one day" to do a "drive thru" and either

18  climbing on the roof of a nearby building or throwing the Molotov

19  cocktail "across the fence" to reach a "critical portion" of the

20  substation.  (Id.)

21      At one point, defendant wrote Brannon a letter in which he

22  stated: "The rifle is in a box in my room waiting to be used in the

23  upcoming race war . . . . VOTING DOESN'T CHANGE ANYTHING.  IF IT DID,

24  IT WOULD BE ILLEGAL."  (Id.)  Defendant then wrote: "Every single day

25  spent alongside these godforsaken 2 party fags make [sic] me hate

26  American politics more.  I have an unbelievable desire to murder

27  journalists and politicians as soon as some chaotic event begins."

28  (Id.)

1    Throughout the early summer of 2023, defendant and Brannon also

2 discussed and researched how to attack the parking lot or electrical

3 room of Dodger Stadium on a night celebrating LGBTQ pride, including

4 by using a remote-detonated device.  (Id.)  As part of those

5 conversations, Brannon shared a "WW2 sabotage manual" with defendant

6 and the two discussed doing "dry runs" to "case" the stadium.  (Id.)

7 Defendant and Brannon were arrested two days before the Pride Night

8 at Dodger stadium.  (Id.)

9    Defendant and Brannon appear to have subscribed to and been

10 motivated in part by their shared neo-Nazi ideology.  For example, a

11 photograph recovered on defendant's phone showed him, Brannon, and

12 another friend standing in the "Heil Hitler" stance while a fourth

13 friend knelt with a large rifle.  (PSR ¶ 48.)  Another photo from

14 defendant's phone showed Brannon smiling with a Nazi swastika armband

15 superimposed on his arm.  (Id.)  In Brannon's bedroom, agents found

16 handwritten letters from defendant, including one titled "United

17 States Aryan Squad" in which defendant drew symbols associated with

18 the Nazis and wrote: "I feel that you might've forgotten the reason

19 why we train and become stronger, faster, and smarter than the

20 average zambo and mulatto . . . I have not messed with the AR-15 in a

21 while.  However, I'll go buy a roll pin punch set and install the new

22 handguard soon."  (Id. ¶ 50.)  Defendant then described watching the

23 TV show "Man in the high castle" and said he "quit" because, in part,

24 the "main protagonists are a bunch of kikes living in a commune[.]"

25 (Id. ¶ 51.)  Defendant then wrote in large letters: "BOMB ((THEM))

26 NOW" and signed the letter: Good luck to you and I hope you become

27 the strongest killer Marine when you finish BC.  1488 [Swastika

28

4

1  symbol] Sig heil [drawn American flag] Semper Fi.  Love, Tibet."

2  (Id.)

3  **III.  GUIDELINE CALCULATIONS**

4      **A.  Offense Levels and Grouping**

5      As Probation correctly determined, Counts One and Two do not

6  group because they do not involve the same victim, neither embodies

7  conduct that is an offense characteristic to the applicable guideline

8  for the other, and 2H1.1 (which applies to Count Two) is specifically

9  excluded from grouping under 3D1.2(d).  (PSR ¶ 62.)  Accordingly, the

10  court must determine the offense level applicable to each group and

11  then determine the combined offense level applicable to all groups.

12  See U.S.S.G. §§ 3D1.3, 3D1.4.

13      Probation correctly determined that for the group representing

14  Count One (conspiracy to damage an energy facility), the base offense

15  level is 7 under U.S.S.G. § 2B1.1 and defendant's offense level

16  increases to 14 because he possessed a dangerous weapon in connection

17  with the offense.  (PSR ¶¶ 63-65.)

18      For the group representing Count Two (intentional damage to a

19  reproductive health services facility), Probation determined that

20  defendant's offense level is 24 because (1) U.S.S.G. § 2H1.1

21  contemplates application of the offense level from the offense

22  guideline applicable to the underlying offense; (2) defendant's

23  underlying offense was arson, in violation of 18 U.S.C. § 844(i); and

24  (3) defendant's offense level would have been 24 under 2K1.4.  (PSR

25  ¶ 71.)  The application notes of § 2H1.1 provide that the "offense

26  guideline applicable to the underlying offense" means the offense

27  guideline applicable to any conduct established by the offense of

28  conviction.  U.S.S.G. § 2H1.1, cmt. 1.  While defendant did commit

1   arson and admitted those facts as part of his plea agreement, his

2   conviction under 18 U.S.C. § 248(a) does not, standing alone,

3   necessarily establish that conduct.  Cf. United States v. Allen, 341

4   F.3d 870, 895-96 (9th Cir. 2003) (finding that application of

5   aggravated assault guideline was appropriate where the elements of

6   civil rights statute under which defendant was convicted included the

7   elements of aggravated assault).  Accordingly, the government abides

8   by the Plea Agreement and submits that the offense level applicable

9   to the group representing Count Two is 12 because the offense

10  involved two or more participants.[1]  See U.S.S.G. § 2H1.1(a)(2).

11       Under the government's calculations, the group encompassing

12  Count One, which has an offense level of 14, counts as one unit.  See

13  U.S.S.G. § 3D1.4(a).  The group that accounts for Count Two has an

14  offense level of 12, which is between 1 and 4 levels less serious

15  than that for Count One, and thus counts as one additional unit.  Id.

16  Because defendants' convictions amount to two units under § 3D1.4,

17  the Court should apply a two-level upward adjustment to the higher

18  offense level of 14.  U.S.S.G. § 3D1.4.  Thus, defendant's adjusted

19  offense level is 16.

20

21

22

23

---

24  [1] Even if Probation were correct that the Guideline applicable
    to arson applies, convictions under 18 U.S.C. § 248(a) carry a
    statutory maximum sentence of 12 months' imprisonment.  Thus,
25  defendant's Guidelines for Count Two would be 12 months'
    imprisonment, which corresponds to an offense level of 10.  See
26  U.S.S.G. § 5G1.1(a) (capping the guidelines range at statutorily
    authorized maximum sentence).  Because an offense level of 10 is
27  still within 1-4 levels of comparable seriousness as the group
    representing Count One (which has an offense level of 14), defendant
28  would receive the same two-level upward enhancement contemplated by
    the Plea Agreement.  See U.S.S.G. § 3D1.4.

6

**B.    Upward Departure for Dismissed Conduct**

Under U.S.S.G. § 5K2.21, an upward departure is warranted to account for the actual seriousness of an offense based on conduct underlying a charge not pursued in the case as part of a plea agreement.  Here, the government agreed to dismiss the counts for arson and conspiracy as part of the Plea Agreement.  As Probation noted, defendant's offense level for the arson would have been 24 under U.S.S.G. § 2K1.4.  (PSR ¶¶ 75-77.)  Thus, the parties agree that an eight-level upward departure is warranted to bring defendant's offense level to 24, which would have been the applicable offense level had defendant been required to plead guilty to the counts for which he was initially charged.  (Plea Agreement ¶ 16.)

**C.    Upward Departure for Aggravating Circumstances**

Under U.S.S.G. § 5K2.0(a)(2)(A), the Court may depart from the applicable range if there are circumstances that were not adequately taken into consideration in determining that range.  Here, the applicable Guidelines do not account for defendant's motivations; namely, his desire to instigate a race war or his desire to intimidate civilians by making a violent political statement.

Notably, Comment 4 to the terrorism enhancement provides that "an upward departure [is] warranted" in a situation where the "offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)" and "the terrorist motive was to intimidate or coerce a civilian population." U.S.S.G. § 3A1.4.  Both arson (18 U.S.C. § 844(i)) and conspiracy to damage an energy facility (18 U.S.C. § 1366(a)) are enumerated crimes under 18 U.S.C. § 2332b(g)(5)(B) and defendant admitted that his motivation in attacking the Planned Parenthood was to intimidate and

interfere with clinic patients.  (Plea Agreement ¶ 14.)  Similarly, defendant's writings to Brannon reflect that their goal in attacking the energy facility was to instigate a race war.  (PSR ¶ 49.)  Thus, the terrorism enhancement contemplates an upward departure in situations exactly like this one.  Because defendant's terroristic motivation was not factored into his applicable Guideline range, a five-level upward departure is warranted, as agreed to in the Plea Agreement.  (Plea Agreement ¶ 16.)

Factoring an offense level of 16, an eight-level upward departure under U.S.S.G. § 5K2.21, a five-level upward departure under U.S.S.G. § 5K2.0(a)(2)(A), and three points for acceptance of responsibility, defendant's total adjusted offense level is 26. Factoring in his Criminal History Category of I, his adjusted Guidelines range is 63 to 78 months' imprisonment.

## IV.  78 MONTHS' IMPRISONMENT AND 3 YEARS' SUPERVISED RELEASE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY

First, the nature and circumstances of defendant's offenses warrant a 78-month sentence.  Defendant's crimes -- throwing a homemade incendiary device at the entrance of a healthcare clinic and conspiring to debilitate Orange County's electrical grid -- were both egregious.  So too was his motivation for committing those crimes, which were driven by defendant's desire to intimidate healthcare patients and professionals and to create societal instability. Defendant also admitted that he sought to repeat his conduct by attacking a second Planned Parenthood.  In short, defendant weaponized fear and intimidation to achieve his misguided political ends.  The callousness of defendant's conduct here warrants a 78-month sentence.

8

1    Second, defendant's history and characteristics are both

2 mitigating and aggravating.  On one hand, defendant is relatively

3 young and has faced difficulties arising from his mental health,

4 transition to the United States, and the influence of older peers.

5 (PSR ¶¶ 114-142, 149-154.)  On the other, defendant has, at times,

6 exacerbated his own mental health issues through substance abuse,

7 which on one occasion caused a violent outburst for which defendant

8 was criminally charged.  (Id. ¶¶ 105, 158.)

9    Moreover, defendant appears to have adopted a racially motivated

10 violent ideology that inspired him to plan (and in one instance

11 commit) dangerous and cowardly acts which could have harmed or even

12 killed real victims.  Notably, even factoring in the upward

13 departures agreed to by the parties, defendant's Guidelines

14 calculations do not account for much of defendant's conduct,

15 including his plan to attack a second Planned Parenthood or Dodger

16 Stadium on LGBTQ pride night.  A 78-month sentence appropriately

17 accounts for defendant's history of plotting dangerous attacks, while

18 still accounting for defendant's mitigating struggles and relatively

19 young age.

20    Third, a 78-month sentence is warranted to protect the public

21 from defendant's dangerous conduct.  Although defendant paints his

22 conduct with respect to Planned Parenthood as having occurred on a

23 whim, his own admissions make clear that he sought to repeat that

24 incident by attacking a second clinic.  Moreover, defendant was

25 planning additional dangerous and illegal attacks at the time of his

26 arrest.  Thus, a 78-month sentence is warranted to deter him from

27 committing similar acts in the future and to impress on him the

28 importance of complying with the law.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 78 months' imprisonment, a three-year period of supervised release, a $125 mandatory special assessment, and $1,000 in restitution.

Dated: May 20, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division

_____/s/_____
KATHRYNNE N. SEIDEN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA