SHEILA MOJTEHEDI (313002)
sheila@mojtehedi.com
806 E. Avenida Pico, Ste. I-291
San Clemente, California 92673
Telephone (323) 412-0472
Facsimile (323) 403-4170

Attorney for Defendant
Tibet Ergul

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHANCE BRANNON,<br>TIBET ERGUL, and<br>XAVIER BATTEN,<br><br>Defendants. | Case No. 8:23-CR-00100-CJC<br><br>**DEFENDANT TIBET ERGUL'S SENTENCING POSITION** |

Defendant Tibet Ergul, by and through his counsel of record Sheila Mojtehedi, hereby submits his sentencing position and objections to the PSR, which is also being served on the assigned United States Probation Officer.

Respectfully submitted,

Dated: May 21, 2024

/s/
SHEILA MOJTEHEDI
Attorney for Defendant
Tibet Ergul

# I. Introduction

Tibet Ergul has accepted responsibility for deeply troubling crimes. Despite the severity of the offense conduct, the parties extensively negotiated and entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and agree that a custodial sentence anywhere in the range of 60 to 78 months is appropriate. ECF 83, Plea Agreement, ¶ 18. The assigned United States Probation Officer also agrees and has recommended a custodial sentence of 78 months. In sum, though there is some disagreement between the parties and United States Probation Office about the particulars of the guideline calculation, there is relatively little dispute about how Tibet's sentencing should be resolved.

The defense anticipates that the Court will want to know why the high end of the stipulated range is appropriate, especially considering that the Court ordered a 108-month custodial sentence for codefendant Chance Brannon. While Tibet and Mr. Brannon pleaded to certain overlapping offense conduct, Tibet's background includes mitigation not present for Mr. Brannon, and Tibet's involvement in this case differs from Mr. Brannon's in ways that make Tibet less culpable. To that [redacted]

[redacted]

***

[redacted]



[redacted]

***

[redacted]

***

[redacted]

***

[redacted] Tibet's gravitation toward Chance as an authority figure, immigration to the United States at a seminal age, moving to Newport Beach and experiencing significant alienation from his uber-wealthy classmates, further isolation from society during the COVID-19 lockdown, significant history of untreated mental health disorders, and poor judgment and indiscretion experienced by young people in their teens and early twenties (but exacerbated by all of the above) have all contributed to the offense conduct here.

Tibet recognizes what he did was, in his own words, "so stupid." He is remorseful about all the people who have been hurt by his conduct, including the doctors, staff, and patients at the Planned Parenthood clinic. While his arrest and pretrial detention in this case have been understandably difficult for him, he is grateful for the wake-up call that he has experienced from the dark path he was going down. His time in custody has also provided him time to engage in soul-searching about the circumstances that led him here, structure to focus on treating his mental health, and the ability to shift focus on what truly matters to him in life.

## II. Requested Defense Sentence and Guideline Calculation

Pursuant to the plea agreement, Tibet respectfully requests a sentence of 70 months in custody on Count One, 364 days on Count Two to run concurrently with Count One, and all other conditions recommended by the USPO and provided in the plea agreement. Tibet also respectfully requests that the Court recommend he participate in RDAP and be housed at a BOP facility near Southern California, where Tibet's parents have a community of family and friends when they visit from Turkey.

## III. Tibet's History and Characteristics

The PSR, Recommendation Letter, and other documents submitted with Tibet's sentencing position detail Tibet's life and the nature and circumstances of the offense conduct. As the Court will see, Tibet's history is dense despite his young age.[1] While those documents provide a full and complete picture of Tibet's life, several points are highlighted below.

### A. Emotional Neglect and Trauma in Childhood

Tibet loves his parents and is incredibly grateful for their love and support, especially while he has been in custody. [redacted]

---

[1] [redacted]



### B. Immigrating to the United States and Moving to Newport Beach

Despite his father's further absence, Tibet remembers fondly the one year he spent in Ladera Ranch when he and his mother first immigrated to the United States. This is where Tibet met the friends who later introduced him to Mr. Brannon. But Tibet's life changed again when he moved to Newport Beach one year later and began attending Corona Del Mar High School.

### C. Psychological Impact of Isolation Due to the COVID-19 Shutdown Orders and Tibet's Worsening Mental Health Disorders

Tibet was a student at Arizona State University when the COVID-19 stay-at-home restrictions began. This is when Tibet's mental health issues began further deteriorating.

Tibet's feelings and behavior were not just teenage angst or discomfort from new life experiences.

[2] Tibet was also arrested in Arizona in October 2022.

There is no evidence that Tibet knew that taking LSD would cause the effects he experienced.



**IV. The Nature and Circumstances of the Offense Conduct**

The nature and circumstances of the offense conduct are, no doubt, very serious. However, the parties and USPO agree that Tibet is less culpable than Mr. Brannon. *See, e.g.,* ECF 111, USPO Recommendation Letter, at 12. The evidence shows that Mr. Brannon's motivation for the offense conduct was "hate for people who did not look or think like him." ECF 106 at 20. From the defense's perspective, the communications between Brannon and Tibet show that while Tibet understood his friend's sinister motives, participated in the acts Mr. Brannon conceived, and that Tibet harbored his own ideologies, it was Brannon's extreme beliefs, Brannon's willingness to act on those beliefs, and Tibet's vulnerability in seeking Brannon's approval that largely drove the offense conduct here, especially as it relates to the Planned Parenthood incidents. Unlike Brannon, who fraternized with others over the internet who shared his hateful ideologies, the bulk of the evidence here against Tibet only (or significantly) involves Brannon. [REDACTED] This

distinction does not excuse Tibet's conduct, but certainly makes him less culpable than Brannon.[3]

## V. Guideline Calculation

The defense maintains that the guideline calculation stipulated by the parties is correct and agrees with the government's points regarding the USPO's guideline calculation. The parties carefully and methodically negotiated the guideline calculation to reflect the government and Tibet's (admittedly competing) interests here.

Additionally, it is worth noting that the parties included the dismissed conduct departure because, due to the plea structure, the mandatory minimum and guideline calculation for the arson count is otherwise not accounted for in the guideline calculation for Count One. Even though the USPO recommends a lesser departure under §5K2.21, it appears that the USPO is still relying upon the government's dismissal of the arson-related counts, even though those charges are otherwise accounted for in the USPO's calculation of a +24 base offense level for Count Two. *See* ECF 111 at 11. In other words, the defense submits that the USPO's inclusion of an upward departure under §5K2.21 does not make sense if the +24 base offense level is used pursuant to §2H1.1.

---

[3] The government's sentencing position opens by quoting an undated letter Tibet wrote to Mr. Brannon while Mr. Brannon was in boot camp. Various online sources suggest the phrase, "voting doesn't change anything" and "if it did, it would be illegal" has been attributed to different people in history, including Mark Twain ("if voting made a difference, they wouldn't let us do it"), activist Emma Goldman, and American peace activist and priest Philip Berrigan. The earliest example of these words is in a newspaper opinion piece published by Robert S. Bordon, M.D., in the 1970's. The article states, "If voting could change anything it would be made illegal!"

**VI. Protection of the Public**

The proposed Defense sentence, 70 months in custody, is lengthy. It will provide significant time for Tibet to address his mental health challenges (which Dr. Andersen concludes is doable, given the right medical treatment), work through his life traumas, reflect on his actions, and put him well into his late twenties, a time when the brain is significantly more developed. [REDACTED]. And, importantly, Tibet has a strong support system that, while previously in the dark about his unique needs and challenges, will help him stay on course with his life. [REDACTED]

**VII. The Need to Avoid Unwarranted Sentencing Disparities**

The Court sentenced Mr. Brannon to 108 months in custody and Mr. Batten to 41 months in custody. A sentence of 70 months for Tibet is approximately right in the middle. Tibet's overall culpability, while significant, is still less than Mr. Brannon's. In some ways, Tibet's role in the offense conduct is more significant than Mr. Batten's, given the extent of the offense conduct to which he pleaded and boots-on-the-group involvement with Mr. Brannon. In other ways, Mr. Batten is more culpable, given that he provided instruction to Brannon on how to build the Molotov cocktails, helped conceive of the plan to attack Planned Parenthood, had other violent discussions with Brannon fueled by their extreme religious ideologies, and also researched other highly disturbing acts and conduct. *See, e.g.,* ECF 118 at 4-5. A sentence of 70 months for Tibet strikes a balance between these competing factors.

**VIII. Restitution**

The parties have stipulated to a restitution obligation, which Tibet understands has already been paid by Mr. Brannon.

**IX. Remaining 3553(a) Factors**



X. **Objections to the PSR and/or Recommendation Letter**

The following objections do not impact the Guideline calculation:

Page 5 of the Recommendation Letter states, "This conspiracy went beyond mere discussions, as Brannon created an operation plan and gear list—items Brannon was later found in possession of—and Ergul had traveled to one such target for surveillance purposes, which included taking a birds-eye photograph of the facility which he sent to another co-conspirator." Two points are worth making. First, there is no evidence that Tibet knew of or participated in creating the operation plan and gear list found on the flash drive dog tag-style necklace found at Brannon's home (or otherwise knew of the contents of the flash drive). Second, the photograph sent by Ergul to the third party was not taken by Ergul, but is instead a photograph from the internet.

Page 6 of the Recommendation Letter states, "Ergul violated his deferred prosecution program in committing the instant offense." The prosecutors in the Arizona case reinstated that matter because Tibet failed to complete his final class for pretrial

diversion due to his arrest in this case, not because of the government's filing of charges.

Respectfully submitted,

Dated: May 21, 2024

/s/

SHEILA MOJTEHEDI
Attorney for Defendant
Tibet Ergul